**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| MIDAS GREEN TECHNOLOGIES, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 6:24-CV-166-ADA |
| | § | |
| GREEN REVOLUTION COOLING, INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |

**DEFENDANT GREEN REVOLUTION COOLING, INC.'S**
**<u>OPENING CLAIM CONSTRUCTION BRIEF</u>**

**TABLE OF CONTENTS**

I.     Introduction ................................................................................................. 1

II.    Overview of the '457 Patent ....................................................................... 1

III.   Level of Ordinary Skill in the Art ............................................................. 2

IV.    Legal Standard ............................................................................................ 3

  A.   Claim Construction ................................................................................. 3

  B.   Indefiniteness .......................................................................................... 4

V.     Agreed Term ............................................................................................... 4

VI.    Disputed Terms and Phrases ...................................................................... 4

  A.   "weir" (claims 1, 6) ................................................................................ 5

  B.   "a weir, integrated horizontally into the long wall of the tank" (claims 1, 6) ..................... 6

  C.   "a dielectric fluid recovery reservoir . . . adapted to receive the dielectric fluid as it flows over the weir" (claims 1, 6) ................................................................. 12

  D.   "the tank and primary circulation facility comprise a highly-integrated module" (claim 2) 15

VII.   Conclusion ................................................................................................ 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advanced Display Techs. of Texas, LLC v. AU Optronics Corp.*,
    2012 WL 2872121 (E.D. Tex. July 12, 2012) .......................................................................16

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
    672 F.3d 1335 (Fed. Cir. 2012)..........................................................................................14

*Asyst Techs. Inc. v. Emtrak, Inc.*,
    402 F.3d 1188 ........................................................................................................................8

*BASF Corp. v. Johnson Matthey Inc.*,
    875 F.3d 1360 (Fed. Cir. 2017)............................................................................................4

*Bicon, Inc. v. Straumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006)....................................................................................7, 8, 15

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
    783 F.3d 1374 (Fed. Cir. 2015)............................................................................................4

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*,
    224 F.3d 1308 (Fed. Cir. 2000)..........................................................................................11

*Callicrate v. Wadsworth Mfg., Inc.*,
    427 F.3d 1361 (Fed. Cir. 2005)............................................................................................6

*Cartner v. Alamo Grp., Inc.*,
    333 F. App'x 565 (Fed. Cir. 2009) .....................................................................................10

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
    677 F.3d 1361 (Fed. Cir. 2012)..........................................................................................14

*ContentGuard Holdings, Inc. v. Apple Inc.*,
    701 F. App'x 957 (Fed. Cir. 2017) .....................................................................................14

*Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*,
    501 F.3d 1254 (Fed. Cir. 2007)............................................................................................2

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
    672 F.3d 1270 (Fed. Cir. 2012)............................................................................................7

*Env'tl Designs, Ltd. v. Union Oil Co. of California*,
    713 F.2d 693 (Fed. Cir. 1983)..............................................................................................2

*Eon Corp. IP Holdings v. Silver Spring Networks*,
  815 F.3d 1314 (Fed. Cir. 2016)..................................................................7, 8

*ePlus, Inc. v. Lawson Software, Inc.*,
  700 F.3d 509 (Fed. Cir. 2012)...........................................................................4

*ERBE Elektromedizin GmbH v. Int'l Trade Comm'n*,
  566 F.3d 1028 (Fed. Cir. 2009).......................................................................10

*Ernie Ball, Inc. v. Earvana, LLC*,
  502 F. App'x 971 (Fed. Cir. 2013) ....................................................................4

*Graphics Props. Holdings, Inc. v. Asus Computer Int'l, Inc.*,
  2014 WL 4929340 (D. Del. Sept. 29, 2014) ...................................................16

*Hoganas AB v. Dresser Indus., Inc.*,
  9 F.3d 948 (Fed. Cir. 1993)................................................................................8

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
  452 F.3d 1312 (Fed. Cir. 2006).......................................................................14

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA Inc.*,
  450 F.3d 1350 (Fed. Cir. 2006).......................................................................14

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364 (Fed. Cir. 2014)...................................................................4, 18

*Nautilus Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014) ...........................................................................................4

*Panavision Imaging, LLC v. Omnivision Techs., Inc.*,
  2011 WL 1337918 (C.D. Cal. Feb. 7, 2011)...................................................16

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...................................................2, 3

*Playtex Prod., Inc. v. Procter & Gamble Co.*,
  400 F.3d 901 (Fed. Cir. 2005)...........................................................................7

*Regents of Univ. of Minn. V. AGA Med. Corp.*,
  717 F.3d 929 (Fed. Cir. 2013).........................................................................14

*SafeTCare Mfg., Inc. v. Tele-Made, Inc.*,
  497 F.3d 1262 (Fed. Cir. 2007).......................................................................14

*Selex Commc'ns, Inc. v. Google Inc.*,
  2013 WL 1412334 (N.D. Ga. Apr. 8, 2013) ...................................................16

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ........................................................................3

*U.S. Well Servs. v. Halliburton Co.*,
    2022 WL 819548 (W.D. Tex., Jan. 17, 2022) ...............................................15, 16

*VirnetX Inc. v. Apple Inc.*,
    792 F. App'x 796 (Fed. Cir. 2019) ...................................................................6

## I.    INTRODUCTION

Green Revolution Cooling, Inc. ("GRC") respectfully submits its Opening Brief regarding the proper constructions of terms in U.S. Patent 10,405,457 (Dkt. 1-1, "the '457 patent"), which is allegedly owned by Midas Green Technologies, LLC ("Midas"). This brief first introduces the technology at issue and then explains why the Court should adopt GRC's proposed constructions and render claim 2 invalid for indefiniteness.

## II.    OVERVIEW OF THE '457 PATENT

The '457 patent relates to immersion cooling technology that Midas learned about, purchased, and copied from GRC. Midas filed a copycat PCT application on "its" technology on December 13, 2013 and claims priority to two provisionals filed on December 14, 2012 and June 7, 2013. '457 patent at (22), (60).[1] Even if Midas is entitled to these provisional filing dates, they are still years after the dates GRC filed for patent protection on its immersion cooling systems. The '457 patent issued on September 3, 2019.

The '457 patent is titled "Appliance Immersion Cooling System" and relates to using dielectric fluid to cool electrical appliances. *Id.* at 1:21-24. The '457 patent includes a lengthy background section describing prior art immersion cooling systems, including GRC's own prior art (referred to as "Best" in the specification). *Id.* at 1:25-40.

The patent's aspirational purpose was to build upon prior art by providing "an improved appliance tank immersion system . . . that provide[s] performance generally comparable to the best prior art techniques but more efficiently and effectively than known implementations of such prior art techniques." *Id.* at 2:41-46. The alleged inventors' "Brief Summary of the Invention" is

---

[1] There may be a priority date dispute since the '457 application was filed after the AIA took effect and claims priority to provisionals that are dated both before and after the AIA took effect. '457 patent at (22), (60).

reproduced in its entirety below:

<div style="border:1px solid black; padding:1em;">

BRIEF SUMMARY OF THE INVENTION

50    In accordance with a preferred embodiment of our inven-
tion, . . .

BRIEF DESCRIPTION OF THE SEVERAL
VIEWS OF THE DRAWINGS

</div>

*Id.* at 2:48-51.

## III.    LEVEL OF ORDINARY SKILL IN THE ART

Patents are interpreted from the perspective of a person of ordinary skill in the art (a "POSITA"). *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*). The "[f]actors that may be considered in determining the level of skill in the art include: (1) the educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field." *Env'tl Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983). "These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art." *Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

A POSITA at the time of the alleged invention would have had a Bachelor of Science degree in mechanical or chemical engineering and at least two years of experience relating to the design and/or implementation of fluid circulation systems involving application of fluid dynamics and heat transfer principles. Additional education may serve as a substitute for a lack of experience and vice versa. Declaration of Werner J.S. Dahm ("Dahm Decl.") at ¶ 33; *see id.* at ¶¶ 28-40. GRC does not believe the potential priority date dispute noted in Section II impacts the education or experience level of ordinary skill in the art set forth above. *Id.* at ¶ 40.

## IV.       LEGAL STANDARD

### A.       Claim Construction

The process of construing claims begins with the intrinsic evidence. *Phillips*, 415 F.3d at 1313. The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Id.* at 1314. Each claim term is generally construed according to its ordinary and customary meaning as understood by a POSITA at the time of the alleged invention. *Id.* at 1312-13. "The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).

Claims must also "be read in view of the specification, of which they are a part.'" *Phillips*, 415 F.3d at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

The prosecution history may also supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office and the alleged inventor understood the patent. *Phillips*, 415 F.3d at 1317.

Extrinsic evidence can also be useful, but it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (internal quotation omitted). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318.

## B.    Indefiniteness

A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim is indefinite. *Id.* at 901. Indefiniteness is determined from the perspective of a POSITA and must be shown by clear and convincing evidence. *Id.* at 911; *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017). "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012). When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "a court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Ernie Ball, Inc. v. Earvana, LLC*, 502 F. App'x 971, 980 (Fed. Cir. 2013) (citations omitted). The standard "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

## V.    AGREED TERM

The parties agree that the term "plenum" means "a structure for dispensing liquid."

## VI.    DISPUTED TERMS AND PHRASES

There are four disputed terms/phrases. Three appear in independent claims 1 and 6, while one appears in dependent claim 2. Claims 1-2 are reproduced below with the disputed terms/phrases emphasized:

> 1. An appliance immersion cooling system comprising:
> a tank adapted to immerse in a dielectric fluid a plurality of electrical appliances, each in a respective appliance slot distributed vertically along, and extending transverse to, a long wall of the tank, the tank comprising:

_a **weir**, integrated horizontally into the long wall of the tank_ adjacent all appliance slots, having an overflow lip adapted to facilitate substantially uniform recovery of the dielectric fluid flowing through each appliance slot; and;

_a dielectric fluid recovery reservoir_ positioned vertically beneath the overflow lip of the weir and _adapted to receive the dielectric fluid as it flows over the weir_;

a primary circulation facility adapted to circulate the dielectric fluid through the tank, comprising:

a plenum, positioned adjacent the bottom of the tank, adapted to dispense the dielectric fluid substantially uniformly upwardly through each appliance slot;

a secondary fluid circulation facility adapted to extract heat from the dielectric fluid circulating in the primary circulation facility, and to dissipate to the environment the heat so extracted; and

a control facility adapted to coordinate the operation of the primary and secondary fluid circulation facilities as a function of the temperature of the dielectric fluid in the tank.

2. The system of claim 1 wherein _the tank and primary circulation facility comprise a highly-integrated module_.

### A.    "weir" (claims 1, 6)

| Term | GRC Construction | Midas Construction |
|---|---|---|
| "weir"<br><br>(claims 1, 6) | "an overflow structure or barrier that determines the level of liquid" | "an overflow structure or barrier that a liquid flows over" |

The term "weir" was previously construed by Judge O'Connor in _Midas Green Technologies, LLC v. Immersion Systems, LLC_, No. 4:20-cv-00555-O (hereinafter "_Immersion_"), Dkt. 84 at 9 (N.D. Tex. Nov. 22, 2021). Ex. 1[2] at 9. The _Immersion_ court adopted an agreed construction that "weir" means "an overflow structure or barrier that determines the level of liquid." Ex. 1 at 2, 9. This Court later entered a joint stipulation adopting the same construction in a different litigation involving Midas and the '457 patent. _See_ Ex. 2, _Midas Green Technologies, LLC v. Rhodium Enterprises, Inc., et al._, No. 6:22-cv-00050-ADA (hereinafter "_Rhodium_"), Dkt.

---

[2] Unless otherwise noted, citations to an exhibit ("Ex.") are to the exhibit attached to the Declaration of Ashley Moore filed concurrently herewith.

50 at 2 (W.D. Tex. July 11, 2022). Midas proposed the very same construction for "weir" in *Rhodium* that GRC proposes here. *Id.* at 1. GRC offered to adopt this construction to minimize the parties' disputes, the burden on the Court, and the potential for inconsistent results across different proceedings. Midas rejected that offer and demands a new construction defining "weir" to mean "an overflow structure or barrier that a liquid flows over."

Midas has made no effort to explain why its twice-agreed and twice-entered construction is now incorrect. It is not, and the Court should adopt this same construction for the third time. In contrast to GRC's proposal, Midas's new construction injects terminology that is redundant with other aspects of the claims (e.g., the claims separately require a reservoir that receives "the dielectric fluid as it flows over the weir"). For this reason, it should be rejected. *VirnetX Inc. v. Apple Inc.*, 792 F. App'x 796, 811 (Fed. Cir. 2019) (holding that "[a]n interpretation that renders language superfluous is strongly disfavored."). To the extent Midas contends there is a material difference between its old, agreed construction and its new one, GRC reserves the right to address that difference in reply.

**B.    "a weir, integrated horizontally into the long wall of the tank" (claims 1, 6)**

| Term | GRC Construction | Midas Construction |
|---|---|---|
| "a weir, integrated horizontally into the long wall of the tank" (claims 1, 6) | a weir having a horizontal (as opposed to vertical) orientation that is integrated into the long wall of the tank | Plain meaning |

Claims 1 and 6 recite "a weir, integrated horizontally into the long wall of the tank." Both parties initially proposed "plain meaning," but there appears to be a dispute because Midas's purported "plain meaning" reads "integrated horizontally" out of the phrase. *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1369 (Fed. Cir. 2005) (holding that it was error for the

district court to read out a limitation clearly required by the claim language and specification); *Playtex Prod., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 909-10 (Fed. Cir. 2005) (holding claim construction was flawed in part because it read "substantially flattened" as "flat," effectively ignoring the "substantially" qualifier in the claim). Because of this dispute, it is the Court's duty to resolve the scope of this term. *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318 (Fed. Cir. 2016) (holding that "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it") (quoting *O2 Micro International, Ltd. v. Beyond Innovation Technology Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008)).

GRC contends that this phrase requires a weir, oriented horizontally, that is integrated into the long wall of the tank, thereby giving effect to all words in the claim including "integrated horizontally." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (finding "claims are interpreted with an eye toward giving effect to all terms in the claims"); *Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) (explaining that the Federal Circuit's *en banc Phillips* decision "reinforced the importance of construing claim terms in light of the surrounding claim language, such that words in a claim are not rendered superfluous"); *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (holding the "construction that stays true to the claim language and most naturally aligns with the patentee's description of the invention will be, in the end, the correct construction.")

In contrast, Midas' infringement contentions show that Midas reads "integrated horizontally" out of the claim:



Ex. 3 at 6-7 (annotations added). As shown above, Midas alleges that vertically-oriented holes in the gray boxes that are not integrated in the long wall of the tank satisfy limitations requiring "a weir, integrated horizontally into the long wall of the tank." The claims and specification leave no room for Midas's interpretation that "integrated horizontally" means "non-integrated and vertical." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 955-56 (Fed. Cir. 2006) (holding that "concave" cannot be equivalent to "convex"); *Asyst Techs. Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1195 (Fed. Cir. 2005 (holding that "unmounted" cannot be equivalent to "mounted"); *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 954-55 (Fed. Cir. 1993) (holding that a "solid fiber" cannot be equivalent to a hollow "straw-shaped" element). GRC therefore requests that the Court resolve this dispute regarding the scope of a weir "integrated horizontally into the long wall of the tank." *Eon Corp.*, 815 F.3d at 1318.

The claim language is not complex and it supports GRC's proposal. '457 patent, claims 1,

6; *see id.* at claim 11 ("a weir (22), integrated horizontally into the long wall of the tank (10) adjacent all appliance slots (18)"). The term "integrated horizontally" is simple English and in context means the weir is integrated into the wall horizontally. This is consistent with the surrounding claim language, which requires that dielectric fluid must flow over the weir's overflow lip before it can drain into "a dielectric fluid recovery reservoir positioned vertically beneath the overflow lip of the weir." *Id.*, claims 1, 6.

The specification confirms GRC's proposal. In particular, the specification highlights FIG. 5, which "illustrates, in perspective view, several details of the tank shown in FIG. 1, with special emphasis on the dielectric fluid recovery *weir integrated into the long rear wall of the tank*." *Id.* at 3:1-4 (emphasis added); *see id.* at FIG. 6, 3:5-6, 3:52-54. As figures 5 and 6 show, weir 22 (purple highlighting by GRC) is "integrated horizontally" into the long rear wall of the tank:



"FIG. 5 illustrates, in perspective view, several details of the tank shown in FIG. 1, with special emphasis on the dielectric fluid recovery weir integrated into the long rear wall of the tank;" ('457 patent at 3:1-4)

"FIG. 6 illustrates, in cross-section view, the section C-C in FIG. 5;" ('457 patent at 3:5-6)

FIG. 13 also illustrates "a dielectric fluid recovery reservoir 42 . . . positioned vertically beneath the overflow lip of the weir 22 and adapted smoothly to receive the dielectric fluid as it

flows over the weir 22." *Id.* at 4:27-32. The horizontally-integrated weir allows fluid to flow over it before it reaches the dielectric fluid recovery reservoir 42:



*Id.* at FIG. 13 (annotations added). There are no contrary examples in the claims or specification; vertical, non-integrated weirs are never claimed, described, or illustrated in any figure. *ERBE Elektromedizin GmbH v. Int'l Trade Comm'n*, 566 F.3d 1028, 1034 (Fed. Cir. 2009) (holding that "[w]e generally do not construe claim language to be inconsistent with the clear language of the specification; usually, it is dispositive."); *see also Cartner v. Alamo Grp., Inc.*, 333 F. App'x 565, 568 (Fed. Cir. 2009) (reversing the district court's claim construction because it was "contrary to the [] patent's specification").

Moreover, the alleged inventors knew when to use "vertical" and "horizontal" to describe various elements in the tank. This is shown in FIGS 1 and 11. In FIG. 1, the weir (purple) is illustrated with a horizontal orientation integrated into the rear wall of the tank, while plenum orifices (orange) are integrated vertically in the plenum:



*Id.* at FIG. 1 (annotations added). Likewise, in FIG. 11, the horizontally-oriented weir (purple) is

contrasted with the vertically-oriented appliances/slots (blue) and baffle plate (green):



*Id.* at FIG. 11 (annotations added). If the inventors meant to claim a vertically-integrated weir, they

knew exactly how to do so. *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d

4

1308, 1317 (Fed. Cir. 2000) (holding "we must presume that the use of these different terms in the claims connotes different meanings."). The inventors chose a horizontal, rather than a vertical, integration, which is reflected in the simple and easily-understood claim language. To the extent Midas contends the plain meaning is something other than a horizontal integration, it must say so now so the Court can resolve the parties' dispute.

**C.** **"a dielectric fluid recovery reservoir . . . adapted to receive the dielectric fluid as it flows over the weir" (claims 1, 6)**

| Term | GRC Construction | Midas Construction |
|---|---|---|
| "a dielectric fluid recovery reservoir . . . adapted to receive the dielectric fluid as it flows over the weir" (claims 1, 6) | the dielectric fluid is received by the recovery reservoir as soon as the fluid flows over the weir | Plain meaning |

The parties appear to dispute whether "as it flows over the weir" should be read out of the claims, so for the same reasons noted above, the Court must resolve the issue. Midas interprets this claim language to mean "a dielectric fluid recovery reservoir . . . adapted to receive the dielectric fluid," while omitting "as it flows over the weir" entirely. *See, e.g.*, Ex. 3 at 9-10 (typographical error omitting "as it flows" from the claim language, and relying on an allegation that any reservoir below the weir meets the limitation), 22-23 (similar, without typographical error). The claims and specification confirm GRC's proposal, and thus it should be adopted.

The claim language is straightforward and must be given effect. Here, "as it flows over the weir" means the dielectric fluid is received by the reservoir as soon as the fluid flows over the weir, as opposed to later in time or in a different location.

The specification confirms GRC's interpretation. As shown in FIG. 13, the dielectric fluid recovery reservoir is immediately adjacent to the tank, such that the fluid is in the reservoir as soon

as it flows over the weir:



'457 patent at FIG. 13 (annotations added). Likewise, the specification disclaims and disavows any other arrangements:

> It will be recognized that, *in all of the embodiments described herein*, emphasis was placed on minimizing the total volume of the dielectric fluid circulating throughout each immersion module 10. *We submit that the key concept here* is to move the secondary fluid to the point of heat exchange with the primary fluid, rather than to move the primary fluid to the point of heat exchange with the secondary fluid. Thus, in our preferred embodiment, all of the essential components of the primary circulation facility 28 are tightly co-located with the tank 14 so as to form a highly-integrated module. Further, ***our placement of the reservoir 42 outside of (but immediately adjacent to) the tank 14*** *tends to reduce the total volume of the dielectric fluid (as opposed to the alternative arrangement we proposed in our First Provisional, wherein a recovery trough was disposed within the tank 14)*….

*Id.* at 8:47-62 (emphasis added). "[A]s it flows over the weir" conveys a "key concept" emphasized above: the dielectric fluid enters the dielectric fluid recovery reservoir as soon as it flows over the weir, as opposed to eventually reaching the reservoir as in the "recovery trough" embodiment described above.

Midas therefore disclaimed any other interpretation of the reservoir element by explaining

the immediacy of the flow over the weir into the reservoir is in "all of the embodiments described herein," is a "key concept," and is required to "reduce the total volume of dielectric fluid" over "alternative arrangement[s]." *Id.* Statements leading with "all embodiments" are quintessential indicators of disclaimer. *See Regents of Univ. of Minn. V. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013); *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1316-19 (Fed. Cir. 2006). As are statements that indicate "important" or "key" features and disparage other alternatives. *See SafeTCare Mfg., Inc. v. Tele-Made, Inc.*, 497 F.3d 1262, 1269-70 (Fed. Cir. 2007); *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1372 (Fed. Cir. 2012) (holding that "derogatory statements about [a particular embodiment] reasonably may be viewed as a disavowal."); *Inpro II Licensing, S.A.R.L. v. T-Mobile USA Inc.*, 450 F.3d 1350, 1354-55 (Fed. Cir. 2006) (finding disclaimer when the specification described the feature as a "very important feature" and disparaged alternatives to that feature); *ContentGuard Holdings, Inc. v. Apple Inc.*, 701 F. App'x 957, 961-62 (Fed. Cir. 2017) (finding disclaimer based on the specification's description of "attachment" feature as a "key feature of the present invention."). GRC's proposal should therefore be adopted by the Court.

Midas's interpretation of the claim language also cannot be correct. In particular, Midas argues the claim language should be interpreted as any system that uses an overflow lip and gravity:

> A weir is a gravity fed structure that allows fluid to overflow a lip. The overflowing liquid must be received at a recovery reservoir for collection prior to the fluid being circulated by a pump. Because there is a gravity flow overflow weir in the GRC system, there will be a fluid recovery reservoir. The recovery reservoir must be located vertically beneath the overflow lip to collect the dielectric fluid.

Ex. 3 at 9. Midas's interpretation improperly removes "as it flows over the weir" from the claim. *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1348 (Fed. Cir. 2012) (agreeing

with Aspex that the district court's construction improperly read "free" out of "rearwardly directed free end"); *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (holding "claims are interpreted with an eye toward giving effect to all terms in the claims"). Riot also ignores the specification's description of this feature as a "key" benefit over other alternatives, and its placement in a description of "all embodiments" as explained in the prior paragraph. Accordingly, GRC's construction is the correct one, and Midas's unsupported interpretation should be rejected.

### D.    "the tank and primary circulation facility comprise a highly-integrated module" (claim 2)

| Term | GRC Construction | Midas Construction |
|------|------------------|---------------------|
| "the tank and primary circulation facility comprise a highly-integrated module" (claim 2) | Indefinite | Plain meaning |

Claim 2 requires a "highly-integrated module." This phrase is indefinite because the claims, specification, and prosecution history do not provide an objective baseline for determining when a given module is "highly-integrated." *U.S. Well Servs. v. Halliburton Co.*, 2022 WL 819548, *4 (W.D. Tex., Jan. 17, 2022) (Albright, J.) (explaining that "[w]hen a term of degree is used in a claim, 'the court must determine whether the patent provides some standard for measuring that degree.'") (citing *Biosig Instruments*, 783 F.3d at 1378).

The claim language itself offers no guidance. For example, claim 1 requires an "appliance immersion cooling system" comprising "a tank" and "a primary circulation facility" comprising "a plenum, positioned adjacent the bottom of the tank." '457 patent, claim 1. Claim 2 depends from claim 1 and adds the indefinite requirement that the tank and primary circulation facility "comprise a highly-integrated module." *Id.*, claim 2; *see id.*, claims 6-7 (reciting the same

ambiguous dependent limitation in claim 7). There are no objective guideposts in the claim language to help a POSITA determine the required amount of integration between the tank and the primary circulation facility. Dahm Decl. at ¶¶ 43-46.

Absent objective criteria in the specification, a POSITA has no way to determine when the tank and primary circulation facility are "highly-integrated." Courts routinely find terms of degree like "highly-integrated" indefinite where, as here, that objective guidance is missing. *Halliburton Co.*, 2022 WL 819548 at *6 (holding "that the intrinsic and extrinsic evidence does not provide any 'objective baseline' to enable a POSITA to differentiate 'high pressure' from non-high pressure."); *Graphics Props. Holdings, Inc. v. Asus Computer Int'l, Inc.*, 2014 WL 4929340, at *19 (D. Del. Sept. 29, 2014) (finding "high information content" indefinite because "there is no standard in the specification for measuring what differentiates 'high information content' from 'information content' generally"); *Advanced Display Techs. of Texas, LLC v. AU Optronics Corp.*, 2012 WL 2872121, at *12 (E.D. Tex. July 12, 2012) (finding "highly modulated surface" indefinite because the patent "fails to provide a standard for measuring the difference between a mere modulated surface and a *highly* modulated surface"); *Panavision Imaging, LLC v. Omnivision Techs., Inc.*, 2011 WL 1337918 (C.D. Cal. Feb. 7, 2011) (finding "high-impedance" indefinite where the specification did not provide a standard or context to give the term meaning), *overruled by* Dkt. No. 277 (July 8, 2011) (rescinding indefiniteness ruling), *overruled by* WL 12952006, at *3–4 (May 25, 2012) (finding that "it is clear that the original indefiniteness finding was correct" and holding that the term "high-impedance" is indefinite); *Selex Commc'ns, Inc. v. Google Inc.*, 2013 WL 1412334, at *14 (N.D. Ga. Apr. 8, 2013) (finding "high cost number" indefinite where a POSITA could not determine whether a dialed number is a "high cost number").

Applied here, there is no question that the objective guideposts are absent. The one and

only mention of "highly-integrated module" is in the '457 patent's specification in column 8:

> It will be recognized that, in all of the embodiments described herein, emphasis was placed on minimizing the total volume of the dielectric fluid circulating throughout each immersion module 10. We submit that the key concept here is to move the secondary fluid to the point of heat exchange with the primary fluid, rather than to move the primary fluid to the point of heat exchange with the secondary fluid. Thus, in our preferred embodiment, *all of the essential components of the primary circulation facility 28 are tightly co-located with the tank 14 so as to form a highly-integrated module*.

'457 patent at 8:47-57 (emphasis added). The specification offers no clarity with respect to the subjective term of degree "highly-integrated" beyond reference to another ambiguous term of degree, "tightly co-located" (which is similarly only mentioned once in the specification). While it is apparent from context that "highly-integrated" has to do with some degree of physical spacing between the tank and primary circulation facility components, there are no examples of connection types, dimensions, spacing, tolerances, or other guidance that a POSITA could use to objectively assess the claim language. Whether the tank and primary circulation facility are highly-integrated is left up to the POSITA's subjective opinion, which renders claim 2 indefinite. Dahm Decl. at ¶¶ 46-51.

The prosecution history confirms the lack of objective criteria in the specification. As noted above, the "highly-integrated" language only appears in the specification alongside the term "tightly co-located." The original claim language used "tightly co-located" instead of "highly-integrated." The examiner issued an office action rejecting the "tightly co-located" claim language as indefinite. Ex. 4, Nov. 4, 2016 Non-Final Rejection, at 2 ("The term 'tightly co-located' is not sufficiently understood, or specially defined in the specification, for its metes and bounds to be definite."). The applicant responded by replacing "tightly co-located" with "highly-integrated." Ex. 5, Jan. 31, 2017 Amendments and Remarks at 2, 4. The applicant argued:

> [T]he Applicants intended the term "tightly co-located" to characterize the essential components of the primary circulation facility 28 as being *physically*

> _located sufficiently close to the tank 14_ "so as to form a highly-integrated module", see, lines 6-8. . . . In view of these details and the example configuration set forth in the drawings, Applicants respectfully submit that the term "tightly co-located" _is_ sufficiently well defined . . . . Notwithstanding, in an effort to reduce issues, Applicants have amended claims 2 and 7 to replace the term "tightly co-located" with the term "highly-integrated", an alternative term used in the specification to describe this physical arrangement.

_Id._ at 6. However, Midas's amendment and explanation do nothing to resolve the indefiniteness issue. Shifting from one indefinite term ("tightly co-located") and ambiguous description ("physically located sufficiently close") to another does not provide the objective criteria the law demands. Indeed, claim 1 already requires a plenum (the only required element in the "primary circulation facility") "adjacent the bottom of the tank." A POSITA can only guess as to when the tank and primary circulation facility are sufficiently integrated so as to be "highly-integrated," versus when the components are just "integrated" or merely "adjacent" one another without satisfying claim 2. Dahm Decl. at ¶¶ 52-60.

Accordingly, the term "highly-integrated" renders claim 2 indefinite. _Interval Licensing_, 766 F.3d at 1371 (finding a "term of degree fails to provide sufficient notice of its scope if it depends on the unpredictable vagaries of any one person's opinion") (internal quotation omitted).

## VII.    CONCLUSION

For the foregoing reasons, GRC respectfully requests that the Court adopt its proposed constructions for the following terms:

| Term | Proposed Construction |
|---|---|
| "weir" (claims 1, 6) | "an overflow structure or barrier that determines the level of liquid" |
| "a weir, integrated horizontally into the long wall of the tank" (claims 1, 6) | "a weir having a horizontal (as opposed to vertical) orientation that is integrated into the long wall of the tank" |
| "a dielectric fluid recovery reservoir . . . adapted to receive the dielectric fluid as it flows over the weir" (claims 1, 6) | "the dielectric fluid is received by the recovery reservoir as soon as the fluid flows over the weir" |
| "the tank and primary circulation facility comprise a highly-integrated module" (claim 2) | Indefinite |

Dated: November 25, 2024         Respectfully submitted,

**GREENBERG TRAURIG, LLP**

By: */s/ Ashley N. Moore*
    Ashley N. Moore
    Peter S. Wahby
    Sarah-Michelle Stearns
    Ashley.Moore@gtlaw.com
    Peter.Wahby@gtlaw.com
    SarahMichelle.Stearns@gtlaw.com
    2200 Ross Avenue, Suite 5200
    Dallas, TX 75201

**ATTORNEYS FOR DEFENDANT**
**GREEN REVOLUTION COOLING, INC.**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that counsel of record who have appeared electronically in this case are being served with this document on November 25, 2024 by way of the primary email address that said counsel supplied to the Court's CM/ECF system.

By: */s/ Ashley N. Moore*_____
        Ashley N. Moore